Justice KAVANAUGH, dissenting.
I join Parts I, II, and III of Justice ALITO's dissent. A threshold question in this case concerns the proper standard for evaluating state abortion laws. The Louisiana law at issue here requires doctors who perform abortions to have admitting privileges at a hospital within 30 miles of the abortion clinic. The State asks us to assess the law by applying the undue burden standard of Planned Parenthood of Southeastern Pa. v. Casey , 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992).[1] The plaintiffs ask us to apply the cost-benefit standard of Whole Woman's Health v. Hellerstedt , 579 U. S. ----, 136 S.Ct. 2292, 195 L.Ed.2d 665 (2016).
Today, five Members of the Court reject the Whole Woman's Health cost-benefit standard. Ante , at 2134 - 2139 (ROBERTS, C. J., concurring in judgment); ante , at 2149 - 2153 (THOMAS, J., dissenting); ante , at 2154 - 2155 (ALITO, J., joined by THOMAS, GORSUCH, and KAVANAUGH, JJ., dissenting); ante , at 2178 - 2180 (GORSUCH, J., dissenting). A different five Members of the Court conclude that Louisiana's admitting-privileges law is unconstitutional because it "would restrict women's access to abortion to the same degree as" the Texas law in Whole Woman's Health . Ante , at 2139 - 2140 (opinion of ROBERTS, C. J.); see also ante , at 2120 - 2133 (opinion of BREYER, J., joined by GINSBURG, SOTOMAYOR, and KAGAN, JJ.).
I agree with the first of those two conclusions. But I respectfully dissent from the second because, in my view, additional factfinding is necessary to properly evaluate Louisiana's law. As Justice ALITO thoroughly and carefully explains, the factual record at this stage of plaintiffs' facial, pre-enforcement challenge does not adequately demonstrate that the three relevant doctors (Does 2, 5, and 6) cannot obtain admitting privileges or, therefore, that any of the three Louisiana abortion clinics would close as a result of the admitting-privileges law. I expressed the same concern about the incomplete factual record more than a year ago during the stay proceedings, and the factual record has not changed since then. See June Medical Services, L.L.C. v. Gee , 586 U. S. ----, 139 S.Ct. 663, 203 L.Ed.2d 143 (2019) (opinion dissenting from grant of application for stay). In short, I agree with Justice ALITO that the Court should remand the case for a new trial and additional factfinding under the appropriate legal standards.[2]

In practice, this doctrine's application has been unconvincing and unpredictable, which has long caused me to question its legitimacy. See, e.g., United States v. Sineneng-Smith , 590 U. S. ----, ---- - ----, 140 S.Ct. 1575, --- L.Ed.2d ---- (2020) (THOMAS, J., concurring) (slip op., at 6-9); Whole Woman's Health v. Hellerstedt , 579 U. S. ----, ---- - ----, 136 S.Ct. 2292, 195 L.Ed.2d 665 (2016) (THOMAS, J., dissenting) (slip op., at 2-5); Kowalski , 543 U.S. at 135, 125 S.Ct. 564 (THOMAS, J., concurring). For example, the Court has held that attorneys cannot bring suit to vindicate the Sixth Amendment rights of their potential clients due to the lack of a current close relationship, id., at 130-131, 125 S.Ct. 564, but the Court permits defendants to seek relief based on the Fourteenth Amendment equal protection rights of potential jurors whom they have never met, Powers , 499 U.S. at 410-416, 111 S.Ct. 1364 ; J. E. B. v. Alabama ex rel. T. B. , 511 U.S. 127, 129, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). And today, the plurality reaffirms our precedent allowing beer vendors to assert the Fourteenth Amendment rights of their potential customers. Ante, at 2118 - 2119, 114 S.Ct. 1419 (citing Craig v. Boren , 429 U.S. 190, 192, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) ). But it is fair to wonder whether gun vendors could expect to receive the same privilege if they seek to vindicate the Second Amendment rights of their customers. Given this Court's ad hoc approach to third-party standing and its tendency to treat the Second Amendment as a second-class right, their time would be better spent waiting for Godot.

Common-law courts' recognition of prochain ami or "next friend" standing is not inconsistent with this point. In those cases, the third party was "no party to the suit in the technical sense" but rather served as "an officer of the court" and was legally "appointed by [the court] to look after the interests of [the party lacking legal capacity]," who remained the real party in interest on "whom the judgment in the action [was] consequently binding." Blumenthal v. Craig , 81 F. 320, 321-322 (CA3 1897) (internal quotation marks omitted). In contrast, the real parties in interest here-women seeking abortions in Louisiana-cannot be bound by a judgment against abortionists and abortion clinics.

Although the Court concluded that the abortionists had standing to challenge the constitutionality of abortion regulations in Doe v. Bolton , 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), it did so only in dicta, id., at 188-189, 93 S.Ct. 739. The abortionists' coplaintiffs were pregnant women whom the Court determined had standing to assert their own rights, and thus whether the abortionists had standing was "a matter of no great consequence." Id. , at 188, 93 S.Ct. 739. Even so, the Court only cursorily considered the question whether the threat of prosecution faced by the abortionists was a sufficiently direct injury under the Court's then-existing standing doctrine, id., at 188-189, 93 S.Ct. 739, which was considerably more lenient than our current understanding. The Court did not engage in any meaningful Article III analysis or refer to this Court's third-party standing doctrine. Ibid. ; see also Akron v. Akron Center for Reproductive Health, Inc. , 462 U.S. 416, 440, n. 30, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983) (concluding without any analysis that an abortionist had standing to raise a claim on behalf of his minor patients). And notably, the abortionists in that case had brought suit to vindicate their own constitutional rights to "practic[e] their ... professio[n]." Doe , supra , at 186, 93 S.Ct. 739 ; see also Planned Parenthood of Central Mo. v. Danforth , 428 U.S. 52, 62, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) (concluding, without any analysis of Article III or the third-party standing doctrine, that abortionists had standing in a suit alleging violations of both their own constitutional rights and those of their clients).

Three Justices of this Court have recently taken the position that this rule from Marks , 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260, does not necessarily apply in all 4-1-4 cases, and that such decisions can sometimes produce "no controlling opinion at all." Ramos v. Louisiana , 590 U. S. ----, ----, 140 S.Ct. 1390, 206 L.Ed.2d 583 (2020) (principal opinion) (slip op., at 18). But even under their view, Justice Blackmun's plurality in Singleton would not be considered binding precedent.

Notably, plaintiffs point to no evidence in the record of women who seek abortions in Louisiana actually opposing this law on the ground that it violates their constitutional rights.

Although plaintiffs initially argued that Louisiana's law also violated their procedural due process rights by requiring them to obtain admitting privileges in an unreasonably short time, App. 24, 28, they have since abandoned that claim. And even if they had asserted violations of their own rights before this Court, those legal injuries would be insufficient to establish standing for a distinct claim based on their clients' putative rights. See supra, at 2142.

Quality Check, Find a Gold Seal Health Care Organization (2020), https://www.qualitycheck.org/search/?keyword=louisiana#keyword=louisiana&accreditationprogram=Hospital (listing "[o]rganizations that have achieved The Gold Seal of Approval from the Joint Commission").

Ryan, Negligent Credentialing: A Cause of Action for Hospital Peer Review Decisions, 59 How. L. J. 413, 419 (2016) ; see also Eskine, Square Pegs and Round Holes: Antitrust Law and the Privileging Decision, 44 U. Kan. L. Rev. 399, 401 (1996) ("[H]ospitals have strong incentives to award staff privileges only to those physicians who have proven to be capable and knowledgeable physicians").